LAW OFFICES OF
# JEFFREY LICHTMAN
441 LEXINGTON AVENUE
SUITE 504
NEW YORK, NEW YORK 10017
www.jeffreylichtman.com

JEFFREY LICHTMAN
JEFFREY EINHORN
MATTHEW COHAN

PH: (212) 581-1001
FX: (212) 581-4999

October 3, 2025

**BY ECF**
Hon. Nelson S. Román
United States District Judge
Southern District of New York
300 Quarropas St.
White Plains, New York 10601

    Re:    <u>United States v. Trijya Vakil</u>, 25 CR 226 (NSR)

Dear Judge Román:

### A.    <u>INTRODUCTION</u>

    This letter is submitted on behalf of defendant Trijya Vakil in anticipation of her October 17, 2025 sentencing. With this letter, the defendant respectfully requests a non-custodial sentence, which is both consistent with Probation's recommendation and "sufficient, but not greater than necessary to comply with the purposes" set forth in 18 U.S.C. § 3553(a)(2) due, in part, to the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1); Presentence Investigation Report ("PSR") at p. 24.

    The basis for this request is as follows: *first*, Ms. Vakil is the sole caretaker of her 11-year-old son as her husband tragically and suddenly passed away in 2014. She also cares for her elderly and infirmed parents who reside with her and cannot drive themselves to medical appointments. *Second*, the defendant's criminal conduct is completely aberrational, having zero prior contacts with law enforcement in her 52 years. *Third*, a survey of recent sentences received by defendants in the Southern and Eastern Districts of New York in white collar fraud cases reveals that significant downward variances are commonplace, even in cases with aggravating factors not present here and without the aforementioned family circumstances and other mitigation specific to Ms. Vakil. *Fourth*, Ms. Vakil has already satisfied her forfeiture obligation and returned her criminal proceeds by sending a bank check for $2,447.40 – the total amount of money she made in the scheme – to the United States Marshals Service. And *fifth,* a review of the defendant's life finds that there are many good deeds and the prospects for her rehabilitation

are extremely good, as illustrated by her strong work ethic and letters from friends, family, colleagues, and members of her community.

### B. THE DEFENDANT'S GUILTY PLEA AND RESULTING GUIDELINES RANGE

On May 19, 2025, Ms. Vakil pleaded guilty to a one-count Information which charged her with Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff. See May 19, 2025 Plea Agreement ("Plea Agreement") at p. 1. Ms. Vakil faces no mandatory minimum and a statutory maximum sentence of 20 years imprisonment. Id.

As recounted in the PSR, pursuant to U.S.S.G. § 2B1.4, the base offense level for Securities Fraud is 8 (PSR at ¶ 24) and because the combined $110,587.07 gain from the offense for the defendant and her tippee was more than $95,000, but less than $150,000, 8 levels are added, resulting in an adjusted offense level of 16. PSR at ¶ 16; U.S.S.G. § 2B1.1(b)(1)(E). With three offense levels subtracted for acceptance of responsibility (U.S.S.G. § 3E1.1) and two offense levels subtracted due to the defendant's lack of criminal history (U.S.S.G. § 4C1.1), the total offense level becomes 11, carrying an advisory sentencing range in the Criminal History Category I of 8-14 months imprisonment. PSR at ¶¶ 77-78. Further, because this range falls within Zone B of the Sentencing Table, the minimum term may instead be satisfied by: a) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule found in U.S.S.G. § 5C1.1(e) so long as at least one month is satisfied by imprisonment; or b) <u>a sentence of probation</u> that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment, according to this same schedule. Id. at ¶ 77; U.S.S.G. § 5C1.1(c).

### C. THE DEFENDANT'S BACKGROUND AND THE NATURE OF THE OFFENSE – APPLICATION OF § 3553(a) FACTORS

Since the Supreme Court's decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Sentencing Guidelines have been rendered advisory in nature, leaving sentences to the district court's discretion, guided by the Guidelines and the other factors contained within 18 U.S.C. § 3553(a) and bounded by any applicable statutory minimum and maximum. This Section directs sentencing courts to "impose a sentence" that is "<u>sufficient, but not greater than necessary</u>, to comply with" the "need for the sentence ... to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; [and] to protect the public from further crimes of the defendant ...." 18 U.S.C. §3553(a)(1)-(2) (emphasis supplied). In making this determination, courts are to consider

JEFFREY LICHTMAN

Hon. Nelson S. Román
United States District Judge
October 3, 2025
Page 3

"the nature and circumstances of the offense and the history and characteristics of the defendant ...." 18 U.S.C. § 3553(a)(1).

    i.    **Ms. Vakil's Role and Profit from Her Criminal Conduct**

At the time of the offense, Ms. Vakil was employed as a research and development advisor by Elanco Animal Health ("Elanco") and was assigned to a team tasked with evaluating Kindred Biosciences ("Kindred") as a potential acquisition. PSR at ¶¶ 5-7. As part of her role, Ms. Vakil obtained material nonpublic information about Kindred and informed a longtime friend, Neeraj Visen, about the acquisition, who then asked Ms. Vakil to advise him when the transaction was imminent. Id. at ¶ 10. Ms. Vakil purchased 500 shares of Kindred stock at $4.30 per share and told Visen about her purchase, leading him to purchase 38,000 shares at a cost of approximately $240,000. Id. at ¶¶ 11-12. After the announcement of the acquisition Ms. Vakil sold her shares for a gain of $2,447.40 (Id. at ¶ 14), a paltry sum compared to the $108,139.67 profit realized by Visen. Id. at ¶ 15. While Ms. Vakil was the tipper in this situation, her comparatively small profit is a factor the Court may consider pursuant to 18 U.S.C. § 3553(a)(6). It should also be noted that Ms. Vakil had no knowledge of the amount of Visen's purchase.

    ii.    **The Death of Ms. Vakil's Husband and the Need for Her Presence at Home**

Ms. Vakil's husband tragically passed away at the age of 39 in 2014 from a ruptured aneurysm. Id. at ¶ 50. They had two children together, Vyomini (known as "Mona") and "AV", who are now 20 and 11-years-old, respectively. Id. at ¶ 51. As a young child, AV is "completely dependent" on his mother and there is no one available to care for him in the event that Ms. Vakil is incarcerated. Id. Ms. Vakil's daughter, Mona, is a 20-year-old college student studying chemical engineering at the University of Michigan.

In addition to her children, Ms. Vakil's mother and father, who are both octogenarians, currently reside with her at her home in Wynnewood, Pennsylvania and suffer from various health concerns. Id. at ¶ 42. Her father has hypertension and diabetes, among other issues, and her mother suffers from undiagnosed memory issues and physical injuries stemming from a fall. Id. Ms. Vakil monitors their daily medication and drives her parents to medical appointments as neither of them have ever possessed a driver's license. Id. Her brother, Pranshu Sharma, previously assisted in caring for their parents, but has since moved to Hawaii for work as a radiologist for the Department of Veteran Affairs. Id. at ¶ 43.

    iii.    **The Defendant's Medical Conditions**

As the PSR confirms, the defendant suffers from a complex of physical and psychological conditions demanding frequent monitoring and treatment. See Id. at ¶¶ 56-58. Topping the list,

JEFFREY LICHTMAN

Hon. Nelson S. Román
United States District Judge
October 3, 2025
Page 4

according to the PSR, are "hypothyroidism," and "high cholesterol," and rounding it out are vertigo, acid reflux, and arthritis. Id. at ¶ 56. The defendant takes a menu of prescription drugs for these conditions – including Levothyroxine, Rosuvastatin, and Omeprazol – and sees a stable of doctors to address her "ongoing medical issues." Id. She was also diagnosed as "pre-diabetic" in August 2024, though she has since lost a significant amount of weight and her doctor has since tapered down her Zepbound prescription as a result. Id. Further, she underwent back surgery as a result of sciatica. Id. In addition to her physical ailments, Ms. Vakil has struggled emotionally since the death of her husband in 2014, recently beginning mental health counseling for the first time. Id. at ¶ 57. To be sure, these ailments should be considered in any sentence formulation for the defendant. See, e.g., Oruche v. United States, 20 CR 657 (MKV), 2024 WL 3728702, at *1 (S.D.N.Y. August 7, 2024) (observing that district court considered defendant's "serious health issues" in varying from applicable guidelines range). Ms. Vakil's health issues require ongoing monitoring, dietary restriction, and access to consistent care which may not be reliably provided in custody.

      **iv.** **Recent Sentencings in White Collar Cases Support Our Request for Leniency**

Recent white collar prosecutions in the Southern and Eastern Districts of New York support our request that Ms. Vakil receive a variance in this case from her guidelines range of 8-14 months imprisonment to probation. See 18 U.S.C. § 3553(a)(6); Freeman v. United States, 131 S. Ct. 2685, 2694 (2011) (Sentencing Reform Act "aims to create a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences").

For example, in October 2024, Judge Liman sentenced brothers Michael and Gerald Shvartsman to 28 months and 22 months imprisonment, respectively, representing significant downward variances from their sentencing guidelines of 46 to 57 months and 37 to 46 months imprisonment despite their earning $18.2M and $4.6M from their crimes. See Stewart Bishop, Trump Media Investors Get Prison For Insider Trading, Law360, October 17, 2024, available at: https://www.law360.com/newyork/articles/1891297/trump-media-investors-get-prison-for-insider-trading (last viewed September 3, 2025). These substantial variances occurred even though Judge Liman called the brothers' insider trading scheme "brazen," and described Michael Shvartsman as "just greedy," as he was not young or desperate and was "already a wealthy man," when he and his brother embarked on an insider trading conspiracy involving Trump Media becoming a publically traded entity. Id.

Additionally, in United States v. Chalavoutis, the defendant pleaded guilty to conspiracy to commit mail fraud as it related to a $30M fraudulent prize scheme which was perpetrated through mass mailings requesting small processing fees. 18 CR 349 (JS) (EDNY), ECF Dkt. No. 157. Despite the defendant pleading guilty just one week before trial, and the defendant's

JEFFREY LICHTMAN

Hon. Nelson S. Román
United States District Judge
October 3, 2025
Page 5

facilitating the scheme by setting up shell companies, recruiting straw business owners, deceiving third parties to cover up the scheme, replacing closed bank accounts, and managing the finances, she received a sentence by Judge Seybert of just six months imprisonment, down from guidelines of 70 to 87 months.  Id.; ECF Dkt. No. 173.

In United States v. Bohm, Judge Seybert sentenced the defendant to a term of 24 months imprisonment, also a significant variance from his guidelines of 70-87 months and in significant contrast to the government's request for a guidelines sentence in that case.  18 CR 36 (JS) (EDNY), ECF Dkt. No. 86.  Bohm had been involved in a $8.9M mortgage fraud scheme wherein he and his co-conspirators lied to banks in order to receive loans to refinance properties when in fact the proceeds were diverted and utilized to pay down corporate debt.  Id. at ECF Dkt. No. 71.

Further, in United States v. Philbrick, Judge Stein sentenced Inigo Philbrick to 84 months imprisonment, down from guidelines of 121 to 151 months imprisonment.  20 CR 351 (SHS) (SDNY).  Philbrick had admitted to stealing $86M from art collectors and investors over a four year period and was accused of fleeing to the remote island of Vanuatu to avoid extradition to the United States from the United Kingdom.

In each of the above-referenced cases which had significant aggravating circumstances, defendants received a substantial variance from their sentencing guidelines.  The same should be the case for Trijya Vakil, whose financial gain pales in comparison to the aforementioned cases and who unlike these other defendants has very unique family circumstances with her 11-year-old son and elderly parents relying on her tremendously.

     v.     **The Character Letters**

We have attached nearly 20 character letters in support of this submission, reflecting the significant and meaningful role that Ms. Vakil has played in the lives of friends and family members.  It would be impossible to include a letter from every individual whom the defendant has positively influenced.  Still, the myriad letters on which we do remark paint a consistent picture of a "genuine person with a good heart," (Letter of Kavita Shah, attached as Exhibit A) who is "straightforward, pure, kind-hearted, and a compassionate person," (May 30, 2025 Letter of Abhishek Shukla, attached as Exhibit B) and who has "qualities of selflessness, resilience, and unwavering belief in the goodness of people... ."  June 3, 2025 Letter of Alka Srivastava, attached as Exhibit C.  Sadly, were it not for this sentencing, many of Ms. Vakil's exceptionally good deeds probably would have gone unrecognized.

### The Passing of Chirag Vakil

Ms. Vakil faced many difficult challenges in her life, however, none would prepare her for the tragedy she suffered in 2014 with the sudden passing of her husband, Chirag Vakil. The defendant's mother, Rani Sharma, writes about the life-altering event in her letter to the Court:

> On Jan 4, 2014, Chirag walked inside the house on his way back from India holding his head. I asked if he was hungry, and he said he would sleep as he had a headache. In the middle of the night, 911 was called and Trijya took Chirag to the hospital leaving their 9-year-old daughter with me. Around 7 am I received a call from Trijya to get Mona ready as someone was coming to pick her up as she needed to be at the hospital. Doctors had told Trijya that Chirag was not going to make it and that he could die at any moment as he had suffered a massive brain hemorrhage. They did not even shift him to a bed, and he was still on the transport stretcher. For the next month, I hardly saw Trijya. She came home sometimes to shower and go back to the hospital. <u>She was 12 weeks pregnant and needed to eat properly. Chirag passed away one month after he was admitted to the ICU. AV was born 6 months after his father's death in Aug 2014.</u>

Letter of Rani Sharma, attached as Exhibit D (emphasis supplied). Ms. Vakil's sister-in-law, Nishtha Patel, explains in her letter to the Court how Ms. Vakil never left Chirag's side during this painful time:

> Despite the emotional and physical toll, she remained at the hospital day and night, never leaving his side, hoping for a miracle. But sadly, my brother passed away a few weeks later. It was a devastating time for all of us – but especially for her. She had lost her partner, her emotional anchor.

January 6, 2025 Letter of Nishtha Patel, attached as Exhibit E.

Kavita Shah, in her letter to the Court, describes the uncertain time after Chirag's death as Ms. Vakil was left alone with a young daughter and an unborn child on the way:

> She was in the second trimester of her high risk pregnancy and it was unimaginable how hard it would have been for her to be a pillar of strength after losing her best friend, her husband. She

JEFFREY LICHTMAN

Hon. Nelson S. Román
United States District Judge
October 3, 2025
Page 7

> decided to continue with her pregnancy despite potentially being a single parent to two kids and six months later was blessed with God's chosen child, AV. We in our family believe AV is Chirag's reincarnation.

Exhibit A.

Despite this unimaginable tragedy, Ms. Vakil continued to push forward. Approximately six months after her husband's death, her son, AV, was born. Ms. Vakil's sister-in-law, Chitra Sharma, flew to the United States for his birth, recalling: "I was present in the delivery room when AV was born. Trijya looked at him and cried. She told her daughter we are back to being a family of 3." Letter of Chitra Sharma, attached as Exhibit F.

<u>The Struggles of Being a Single Mother</u>

With little family in the United States, the death of Chirag Vakil left the defendant in a difficult position as a single mother. In his letter to the Court, childhood friend Abhishek Shukla writes about the struggles that Ms. Vakil faced raising two children on her own:

> As a single mother, I have seen her struggles of balancing between raising a family, consistent work pressure, and to take care of her elderly parents. She has taken all these responsibilities head-on, without letting others realize her difficulties. She does not ask for support a lot as she tries to handle her challenges on her own.

Exhibit B. Another of Ms. Vakil's friends, Girish Badgi, writes about the responsibilities that Ms. Vakil was forced to take on after her husband's unexpected passing in his letter to Your Honor:

> Chirag's unexpected passing left a significant void in Trijya's life, disrupting its harmony. During Chirag's lifetime, he managed the family's finances while Trijya took care of the household along with her job at Pfizer. <u>With Chirag gone, the entire burden of caring for their daughter Mona, managing the household, taking care of Chirag's aging parents and handling finances fell upon Trijya.</u>

August 8, 2025 Letter of Girish Badgi, attached as Exhibit G (emphasis supplied).

Friend Manish Shah, who similarly lost his partner to tragedy, writes about his experience

Jeffrey Lichtman

Hon. Nelson S. Román
United States District Judge
October 3, 2025
Page 8

being a single parent in his letter to the Court:

> Our life situations are similar; we both lost our soulmates to aneurysm... Unlike her though, my loss happened when my boys were 23 and 17, already independent. ... God has made this life where both parents have a role. When one parent is off balance, angry, busy, the other steps in to balance out, proving for the stability that growing children need. And society doesn't make it any easier. Everywhere, you are reminded that you, as a single parent, have something amiss, at school, at a social function, at any gathering. People want to know where the other half is. If life is difficult to be a single father, it is much harder for a single mother in our patriarchal society. ... While I would have liked to share my remaining life with her, Trijya's focus on prioritizing her children's future takes precedence over her own plans and happiness. We stayed just friends as a result.

June 20, 2025 Letter of Manish Shah, attached as Exhibit H.

To protect her children and out of respect for her deceased husband and his family, Ms. Vakil has chosen not to pursue a new relationship. Her childhood friend, Swati Omanwar, explains Ms. Vakil's reasoning for remaining single in her letter to Your Honor:

> She decided not to get into another relationship as it meant attention away from her kids and the safety and security of her daughter who was growing up. She also cared a lot about her in-laws' feelings. She coped with her loneliness and sorrow with her usual talkative and positive attitude and staying close to friends.

Letter of Swati Sharma Omanwar, attached as Exhibit I.

Ms. Vakil's father, Hemendra Sharma, in his letter to the Court, discusses additional hardships that his daughter faces as a widow in their culture:

> Since my son-in-law passed away, I have not seen her calling families over for dinner or she getting invited for dinners anymore. In our community young widows find less opportunities to interact with individuals other than immediate family members and existing friends. Plus, the responsibility of raising kids alone does not allow her time. <u>Also in our community, such early widowhood</u>

JEFFREY LICHTMAN

Hon. Nelson S. Román
United States District Judge
October 3, 2025
Page 9

> is nothing short of a nightmare as remarriage in such cases is an exception rather than rule.

Letter of Hemendra D. Sharma, attached as Exhibit J (emphasis supplied).

### A Dedicated Mother and Family Member

Even amidst tragedy, Ms. Vakil remains the glue that holds her family together. Multiple of the submitted letters reference Ms. Vakil's dedication as a dedicated single mother of two children who also cares for her parents and supports her extended family. In his letter to the Court, her brother lauds his sister's efforts: "Our parents are 80 years old and that puts responsibility on her for their regular appointments and care. But she is happy taking these responsibilities as it allows AV to have more people around him that love him."[1] June 27, 2025 Letter of Pranshu Sharma, attached as Exhibit K. Ms. Vakil's mother, Rani, explains a few of the ways that her daughter cares for her and her husband in their old age:

> I had fallen from the stairs in 2018 and needed an immediate hip replacement since then I have not been the same. I am now 81 years old, and my memory fails me at times. I don't remember the recipes for the food I used to make every day. ...
>
> ***
>
> As my husband and I are over 80 years old, Trijya wanted us to live in the US vs India. Trijya wanted me to avoid another fall at all costs. So, Trijya had got an extension done to her house and added a bedroom for us on the first floor so that I didn't have to go up and down the stairs multiple times a day. ... We don't drive so she does all the driving to the grocery stores, our medical appointments and filling in the prescriptions. She has a lot on her plate as a mother and a daughter, and she keeps doing that with an acute sense of responsibility.

Exhibit D.

---

[1] The PSR indicates that Ms. Vakil's parents were in India at the time it was prepared. While this was true, her mother suffered a complication during surgery while in India, causing the parents to stay longer than expected in India. However, Ms. Vakil's parents presently reside with her in Pennsylvania.

JEFFREY LICHTMAN

Hon. Nelson S. Román
United States District Judge
October 3, 2025
Page 10

In his letter to Your Honor, Ms. Vakil's father, Hemendra Sharma, further describes how the defendant cares for him and his wife in their old age:

> And true to her basic nature since childhood, she takes care of my wife and me, her parents. We are both eighty now and suffer from many old age problems. I have been a diabetic for the last two decades and my wife is in early stages of dementia. Trijya supports us and takes care of our medical appointments and our everyday needs.

Exhibit J. Ms. Vakil has also made tremendous efforts to support her husband's family, as described by her childhood friend Alka Srivastava in her letter to the Court:

> I have seen her dedication to ensuring her children maintain a close relationship with their paternal grandparents in India through regular weekly video calls and yearly visits. Trijya also supports her in-laws financially. She journeys to India each year to honor her husband's memory and celebrate AV's every birthday with them, a testament to the enduring power of connection.

Exhibit C. Ms. Vakil's brother-in-law, Tushar Vakil, also describes the tremendous efforts of Ms. Vakil to keep her and her children connected with her husband's family:

> Trijya is also amazing at keeping family connections strong. Chirag's parents, my uncle and aunt, live in India. She makes sure to visit them almost every year with both of her children. These trips really show her love and respect for Chirag's family, and how much she wants her kids to stay connected to their grandparents and their culture.

Letter of Tushar Vakil, attached as Exhibit L.

In addition to balancing her full-time job and taking care of her elderly parents, Ms. Vakil also cares for her two children, ages 11 and 20. Ms. Vakil's daughter, Mona, commends her mother's wisdom and sacrifices in her letter to Your Honor:

> My mother and I had numerous arguments stemming from her desire for my success; the frequent moves, my lack of desire to thrive in school, and my hesitance to participate in extracurricular

JEFFREY LICHTMAN

Hon. Nelson S. Román
United States District Judge
October 3, 2025
Page 11

> activities led to more and more arguments. ... I pushed against her recommendations to focus on school and against her recommendations to apply to closer colleges, and instead, I went to Michigan, a very expensive school that she now pays for, all because she wanted me to succeed. ... She took on roles that a mother shouldn't have to do alone when my father died, and to this day she handles everything herself. She found a job that was a demotion in role and pay compared to her previous one after Covid-19 to ensure that we could pay for our mortgage, my college tuition, and send money to India for my grandparents and relatives. She gave up on her desires for a beautiful home with a spacious kitchen or a car newer than 2012, and she focused on her career to give her children the best education she could. ... I wouldn't be as successful as I am without my mother's constant sacrifices.

Letter of Vyomini (Mona) Vakil, attached as Exhibit M.

The defendant's brother, Pranshu Sharma, also describes the significant support that the defendant provides to her children:

> Her relationship with her kids is amazing. Despite all the pressures she takes time to give to the children all the attention they need. She provided all the mental and financial support for her daughter including extracurricular activities and helped her academically. With her help Mona got into a top rated school in the field that her dad specialized in. Since she left for college Trijya's life revolves around AV. She has been the mom and dad to her kids. He cannot bear to be away from her even for a day. Being somewhat a weak child with minor infections recurring, he needs constant supervision. That he has been doing well academically and pursuing extracurricular activities is a testimony to the attention Trijya provides him. He is in middle school and getting busier and needs her more to be able to keep up with school and other activities. He likes swimming, music, and playing time with friends which Trijya has been able to organize for him. AV enjoys cooking and Trijya gets him into a cooking camp every year. This year he learnt surfing too when he came to visit us in Honolulu. Trijya is extremely proud of him. She hopes that his weight gets better with age, and he can take up more sports. The next eight years are crucial for AV. He has entered middle school, and he

J<small>EFFREY</small> L<small>ICHTMAN</small>

Hon. Nelson S. Román
United States District Judge
October 3, 2025
Page 12

> needs to learn to balance time between play and studies. She is a
> constant source of guidance and advice for him. She worries a lot
> about AV as he is at the most impressionable age right now.

Exhibit K.

### A Friend and Source of Support to Others

In light of the foregoing messages concerning her dedication to family members, it should come as little surprise that letters from Ms. Vakil's friends and former colleagues likewise hail her support of them. See, e.g., Letter of Swati Omanwar, Exhibit I ("When I lost my father in class eleven, Trijya became by source of strength and positivity. Her unwavering support and love helped me through those difficult times"). For example, Girish Badgi writes of one of her selfless acts in his letter to the Court:

> Trijya's late husband, Chirag, had lent a childhood friend of his
> INR 25,000,000 ($30,000). The friend suffered a stroke and could
> not work and struggled to repay the loan. Despite facing her own
> challenges, Trijya chose to forgive the repayment, showcasing her
> compassion and willingness to help those in need.

Exhibit G.

Similarly, former colleague Vaibhav Nagpal informs in his letter of the support that he received from Ms. Vakil: "I was new to the US and did not have a huge bank balance and I needed funds for the down payment towards the house, she offered me $50,000 without hesitation which I later repaid. This act speaks volumes about her character, generosity, and trust in people." June 2, 2025 Letter of Vaibhav Nagpal, attached as Exhibit N.

### A Valued Member of the Community

In addition to Ms. Vakil's dedication to friends, colleagues and family members, multiple submitted letters reference her commitment to her community. See, e.g., Letter of Cathy Martin, attached as Exhibit O ("She has volunteered with organizations such as St. Hubert's Animal Welfare Center, United Way, the Animal Care and Control (ACAC) in St. Louis, and local food banks. Her dedication to service and community speaks about her character and compassion for others"). Ms. Vakil's father, Hemendra Sharma, in his letter to the Court, adds:

> Once she grew up, and joined the university to be a veterinarian,
> and did community service for adult education in nearby villages

**JEFFREY LICHTMAN**

Hon. Nelson S. Román
United States District Judge
October 3, 2025
Page 13

> teaching women how to read and write.
>
> My university town had problems with street dogs and Trijya was a member of the team that used to catch and take sick and injured dogs to the university veterinary hospital for treatment and care. The main door of my house always had a handful of street dogs barking and waiting for her to come out and feed them.

Exhibit J.

### Sincere Regret and Remorse

Finally, several of those who submitted letters on behalf of Trijya Vakil observe her sincere regret and remorse for her criminal conduct. She is ashamed for disappointing her friends and family, who depend on, and look up to her. For example, friend Dharmesh Sheth writes: "Since this incident, Trijya has expressed deep remorse and taken responsibility for her actions." June 2, 2025 Letter of Dharmesh Sheth, attached as Exhibit P.

Ms. Vakil also strongly believes in personal responsibility and learning from one's own mistakes. She is eager to make amends for her actions. Friend Girish Badgi recalls: "In my multiple conversations with Trijya, she is deeply remorseful for her actions. She takes full responsibility and is taking steps to make changes in herself. I know she has started therapy which she did not even do after Chirag's death." Exhibit G.

While her mistakes have taken a toll on her, Ms. Vakil is ready to move forward with her life and spend each remaining day redeeming herself by making positive contributions to society and focusing on raising her son. Meenal Bharadwaj writes:

> She regrets her actions wholeheartedly and just wants to focus on the next few years of her life which are very crucial for her young son. I can never forget whenever I ask her what she is doing about her own life, she fondly counts and says 'I am just living for 7 years, 2 months and 28 days before AV goes to college after which I will think about myself.'

June 2, 2025 Letter of Meenal Bharadwaj, attached as Exhibit Q.

JEFFREY LICHTMAN

Hon. Nelson S. Román
United States District Judge
October 3, 2025
Page 14

### D. CONCLUSION

Defendant Trijya Vakil comes before this Court asking for mercy. A life filled with hard work and dedication to her family members and friends will be forever tarnished by her criminal choices. Nevertheless, as the powerful enclosed letters reveal, Ms. Vakil is an uncommonly decent and giving woman who unlike many defendants has made extraordinary efforts to help others throughout her life, when no one was watching, when she had no need to impress a judge deciding her fate. For these reasons and the others stated herein – including her exceptional family circumstances – a non-custodial sentence, consistent with Probation's recommendation, is respectfully requested.

Respectfully submitted,

Jeffrey Lichtman

Encs.

cc:   James McMahon, Esq.
      Assistant United States Attorney (by ECF)